MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Paige B. and Robert B., Jr. to their daughter, Charlene B., now six years old. This little girl came in to the care of the Department of Children and Families, (hereafter the "Department"), on several occasions. She was removed from her parents on two occasions and twice adjudicated a neglected child. The last such adjudication was on May 9, 1996. Both parents have had long standing difficulties with alcohol abuse which have impacted upon their ability to parent their daughter.
The Department seeks this termination on the grounds that Charlene was previously adjudicated neglected and that each parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112 (c) (3) (B).
The court finds that both parents were duly served, have appeared and have court appointed attorneys. Both parents contest the petition and vigorously oppose the Department's case. Paige B. has filed a motion for revocation of commitment which the court will consider, based on the trial testimony. The court has jurisdiction in this matter; there is no pending action affecting the custody of Charlene in any other court and reasonable and extensive efforts have been made to reunite her with her parents. The court, having reviewed the verified petition, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and the court-appointed psychiatric evaluator, Dr. Sadler, makes the following factual findings and reasonable inferences supported by those findings: CT Page 12009
Factual Background and Department Involvement with the Family:
Both parents do not deny problems in their lives with alcohol addiction extending over many years. They met when Paige was performing community service, following her conviction for driving while under the influence of alcohol. Paige B. and Robert B., Jr. were married on June 16, 1986. In April of 1988, Paige gave birth to their oldest child, Robert B., III. At age six months, their son was diagnosed with fetal alcohol syndrome and began receiving services from the Department of Mental Retardation. On May 12, 1989, this child was committed to the Department and on March 13, 1990, the parents consented to the termination of their rights to this child, as they could not control their alcohol abuse. Their second child, Charlene, was born on August 21, 1991. Her mother admits to consuming alcohol during the first few months of this pregnancy. By September 3, 1993, this child too had been adjudicated neglected and placed under protective supervision. Such supervision was extended three times. During these periods of supervision, Robert B. was making significant progress in treatment, but more was still necessary. However, Paige had not then achieved any measure of stability. In April of 1994, a liver test showed that she was still regularly consuming alcohol. She then entered the partial hospitalization program at Middlesex Hospital. On April 13, 1995 when Charlene was not quite four years old, she was removed from the household by the Department and placed into foster care. At that time, Paige B. admitted to regularly drinking five beers a day and mixing alcohol with her psychotropic medication, Klonopin.
After Charlene's removal, both parents continued with alcohol treatment and their efforts at sobriety were somewhat more successful. They complied in part with the expectations set for them by the court and attended counseling sessions and parenting education classes. Charlene had a difficult time adjusting to foster care and exhibited some extreme acting-out behaviors during this time. She had violent tantrums and ate dirt, twigs and other inedible objects. She also had sleep disturbances and did not eat reliably. She was removed from the first foster home and placed in a second home, where the behaviors deceased in seventy, but continued. She received counseling to deal with her behavioral disorders.
On January 11, 1996, based on the progress her parents had made, her commitment was revoked and Charlene was returned to her CT Page 12010 parents under protective supervision. Supportive services were offered to the home, including a parent aide. No untoward events in the household were noted for some time. Due to the history of alcohol abuse, the Department made it clear to the parents that any alcohol consumption, while Charlene was in their care, would cause not only her removal from their care but also the filing of a termination petition. Expectations were set concerning alcohol treatment and counseling.
During the next few months, Charlene continued to exhibit the behaviors seen in the foster homes and was diagnosed at the Newington Children's Hospital as having Attention Deficit Disorder hyperactivity impulsivity type. The parent aide and the counselor assisted Paige in coping with this difficult and emotionally extremely needy child
Despite all the supports and assistance, on April 4, 1996, during an unannounced home visit, the Department discovered that both Paige and her husband had been drinking. Charlene was removed and placed in her present foster home. She was adjudicated a neglected child on May 9, 1996 and on October 21, 1996, the present petition for termination of parental rights was filed with the court.
With Respect to the Mother: (Paige B.)
Paige B. is presently forty-two years old and is employed at a pharmacy, where she is a well-respected employee. She has been able to maintain her sobriety since April 4, 1996. She is a high school graduate who has been employed through the years as a waitress, nurse's aide, typist and factory worker.
Alcohol abuse has cast a dark shadow over her life for a long time. She began drinking to excess as a teenager. She has been involved in substance abuse treatment for at least ten years. Her efforts at treatment were testified to by herself, by her present counselor, Ellie Sears Henriques, and by Patricia Burke, who assisted in her medication review and monitoring. Paige reports herself to have Attention Deficit Disorder and to be "hyper" and as having used alcohol to `self-medicate'. She has been involved in continuous alcohol treatment since 1993, when she was also placed on medication for her anxiety. In April of 1994, a liver test showed that she was still regularly consuming alcohol. She then entered the partial hospitalization program at Middlesex Hospital. Because of her regular attendance and other efforts, CT Page 12011 she was permitted to stay and complete the program despite three lapses. After completion of the program, she attended the Rushford Center and there received individual counseling.
Unfortunately Paige did not benefit from the treatment and counseling she was receiving. It did not make a sufficient impact to keep her sober or immediately reach out for help at the first slip from sobriety. On April 13, 1995, the Department discovered Paige intoxicated at home with Charlene. She admitted to having five beers that day and on each of a number of days prior to that time. She reported that she was mixing her psychotropic medication with alcohol to help with her hangovers and taking other prescription medication as well. It was during this time that she reported blackouts with no recollection of what took place during those blackouts. She assumed that her husband took care of Charlene during those times.
After Charlene was placed in foster care, Paige began to attend the day partial hospitalization program at the Rushford Center in May of 1995. She successfully completed phases I, II and III of the program. She was also attending Narcotics Anonymous at the same time. She was involved with individual and family therapy with Dr. Russolillo, one of the witnesses at trial. She and her husband made progress in treatment and there were no reports of substance abuse from any of the service providers. In addition to substance abuse counseling, Paige attended a STEP (Systematic Training for Effective Parenting) group. On January 11, 1996, after a court hearing on mother's motion to revoke the commitment, Charlene was returned home. Both parents appeared to continue to progress in their alcohol treatment. The various court expectations previously established were again set in place upon the revocation of the commitment.
Yet on April 4, 1996, almost exactly one year since Charlene was first removed from her parents' home, she was again removed when both parents were found to be abusing alcohol. The social worker, Elizabeth Serrano, came to the residence unannounced and found that Paige was drinking beer. Her husband was present and also intoxicated. Given Ms. Serrano's observation that the parents had violated the court-ordered expectations and in view of the parents' previous history, she then removed Charlene from the home after invoking the ninety-six hour emergency hold.
Despite all of the support and assistance each had received, neither parent could remain sober or assist the other to remain CT Page 12012 sober to provide care for Charlene. Paige has described this event as a "two beer" slip, and others, including Dr. Russolillo, have testified that such a slip after a year or more of sobriety is expected of those suffering from the disease of alcoholism. Indeed, Dr. Sadler stated "that a single drunken episode over a nearly two year period of abstinence would constitute a remarkable success." Nonetheless, such observations view the event in isolation and from the optic of the progress of the disease of alcoholism and not the lens of an emotionally neglected child.
As of April 4, 1996, neither parent could then effectively utilize the supports in place, whether through AA, NA or their various counselors, to either prevent or to deal with their relapse appropriately. The stresses in their lives, including the stress of dealing with their emotionally needy and demanding child, proved to be too great a burden on their fragile recovery efforts. The dark shadow cast by alcohol once again covered them and Charlene.
By all reports, since April of 1996, Paige has remained sober and is doing well in her counseling. Nonetheless, Ellie Sears Henriques, her counselor at Rushford who has been working with her since 1996, believes that she remains at average risk for relapse, even now with the various supports she has in place. Without such supports, she is at high risk of relapse. Adding the stress of the return of her daughter to her life would be expected to elevate that risk. She would need continued support, as well as weekend support to be able to care for Charlene. Dr. Russolillo reports much the same information, adding that the parents have made progress in their interpersonal relationship and that he believes Paige has gained some insight into parenting issues. None of these professionals saw the parents with their daughter or worked at any time with the child. Each witness openly admitted and acknowledged the limitations this lack placed on their opinions.
Dr. Sadler performed a psychiatric evaluation of the parents, the child and the foster parents. His lengthy and detailed report of February 15, 1997 became an exhibit before the court. He found that Mrs. B. was:
 "an intellectually limited woman who demonstrated a chronic style of causal indifference to the effects of her alcoholism upon the life of her children Mrs. B. holds herself blameless for the CT Page 12013 neglect of her daughter. Mrs. B. has no insight into the nature of the parent-child relationship. Mrs. B. readily uses deflection or the blaming of others to respond to each of her parental failures. Mrs. B. shows no increased insight into the nature of her parental difficulties or interpersonal deficits over the eight years since DCF identified her alcoholism as severely effecting her children . . . I have no confidence that Mrs. B. has minimally addressed her alcoholism or the effect that it has upon others."
In his answers to the specific referral questions, Dr. Sadler found that the parents gave lip service to their willingness to participate in treatment programs. He saw little indication than there had been any change or increased awareness of their parenting difficulties after years of individual therapy. As to Paige's parenting ability, he found that:
 Mrs. B. largely reacts to her own internal needs while she demonstrates what may appear superficially to be affection and attention toward her child. Mrs. B "affection" is in fact an expression of Mrs. B.s' own desires and needs rather than a reflection of her understanding of Charlene's needs . . . the interaction between Mrs. B and Charlene is a pathological (emphasis added) relationship which has not even begun to be appreciated by Mrs. B as to its negative effects on Charlene. Mrs. B generally blames Charlene, rather than herself, for the interpersonal difficulties within the family. Mrs. B has an attachment to her daughter which reflects Mrs. B.s' own narcissistic needs rather than appreciating or meeting the needs of her daughter".
He found no evidence of "an even beginning personal rehabilitation that would encourage a belief that at some time in the future that either parent would be able to develop parenting skills that they have not demonstrated at any time in the past."
After the conclusion of the evaluation interviews, some questions arose concerning whether possible side effects of the medication Paige was then taking contributed to the observations of her state as observed by Dr. Sadler. During the evaluation, he found her to be casual and relaxed. He stated that she speaks
 "with little apparent thought. She is distractible and inconsistent and unconcerned about her inconsistencies. While Mrs. B. shows symptoms of significant anxiety as well as a short attention span, impulsivity and easy distractibility, she also shows disorganization in her thinking, and easy and casual excuse of her own failures and no sense of responsibility for the neglect and emotional abuse that has been CT Page 12014 inflicted upon her daughter.'
He determined in his second report that medication side effects would not cause such conduct.
His conclusions concerning the prospects for this family are bleak:
 "Mr. and Mrs. B. have failed to attend to their daughter's needs and that the difficulties and disabilities demonstrated by Charlene are importantly influenced by her parents' failure to attend to her individual emotional needs. Neither parent recognizes their failing in this regard. . . . The B.'s do not demonstrate an understanding of their child's needs, nor do they demonstrate empathy for Charlene's emotional reactions."
He recommended that the child should not be permitted to live with either of her parents and stated:
 "I do not find either Mr. or Mrs. B would be able to provide minimally adequate parenting for their child. . . . Neither parent has been able to identify the parenting failures and a failure of emotional connection that have been the primary detrimental factors, further aggravated by intrauterine alcohol exposure, leading to Charlene's behavioral and emotional difficulties at the present time."
With Respect to the Father: (Robert B., III)
Robert B. is thirty-three years old and admits to excess alcohol consumption as a "binge" drinker. He states he can abstain from alcohol for some substantial period of time, but then consumes it to excess. He, too, has been receiving treatment for a substantial period of time. He reports his alcohol use started when he was twenty.
Mr. B. completed the eleventh grade and has held a series of factory jobs. Since 1990, his employment has been sporadic with periods of substantial unemployment. He was employed in 1997, but his position was terminated shortly before the commencement of the trial. Mr. B. has had some involvement with the criminal justice system, including charges for domestic abuse of his wife, Paige, in June of 1993.
He has received substantial alcohol rehabilitative services. He was involved in substance abuse treatment at the Rushford CT Page 12015 Center, where he successfully completed the program. He attended the Rushford Center's relapse prevention program. In 1996, he began counseling at the Connection, Inc. and has continued to attend group sessions and address issues of relapse prevention. Donna Grisham, a substance abuse counselor at Connections, testified that Robert B. is consistent with his attendance at his group session and that, in her opinion, his prognosis for staying sober is good. Alan Pitts, a counselor employed at the Rushford Center when Robert attended there also shared this viewpoint. Mr. Pitts would have liked to see more consistency in his attendance in 1993 and 1994, but felt that he had worked hard in his treatment.
Dr. Sadler found, however, that despite the significant access to treatment, that Mr. B., as well as Mrs. B. have failed to respond to appropriate interventions. Both have significantly impaired judgment:
 ". . . Mr. B. has demonstrated nearly ordinary interactions with his daughter yet he is not able to identify her developmental needs. He fails in his own parental responsibility to identify the difficulties between Charlene and her mother. Mr. B., in this way, demonstrated the same parental failure to provide the needed physical structure and emotional connection and emotional relationship for Charlene. Mr. B. ignores the pathological relationship between his wife and his daughter . . . He is unable to utilize his greater emotional perceptiveness to facilitate his wife's care of their child."
With Respect to Charlene:
Charlene is now six years old. She has been in three foster homes, the last since April of 1996, where she has had continued difficulty with the behaviors she previously exhibited. She has bouts of nightmares, inability to sleep, difficulty with eating and engages in self abusive behaviors such as banging her head against the head board of her bed and punching herself in the stomach and extreme tantrums. She continues to be an emotionally needy child, who is difficult to control, and has highly specialized needs. Charlene has been on medication since the fall of 1996 and the medication has assisted in calming these behaviors. Despite her emotional difficulties, she is developmentally on target and is enrolled in school.
She has been in treatment with a therapist since her placement in 1996. One of her therapists, Nancy Kahn, diagnosed CT Page 12016 her as having Post Traumatic Stress Disorder and has attempted through play therapy to assist with Charlene's adjustment. She stated that she sometimes noticed in Charlene withdrawal and dis-associative behaviors found with this disorder and that her impulses to self-mutilate had to do with her sense that she was a "bad" girl. In play therapy, she found constant themes of self-hate and badness. Charlene would wash her hands frequently and repetitively as though to cleanse herself. Ms. Kahn stated that "this child does not have the sense that she is safe". She found that the pathology and the level of disturbance in this child runs too deep for the symptoms to be a result of foster care and the many changes that Charlene has experienced. "It speaks to something that happened earlier in her life with her biological family", she stated, "and that early on, she did not have the necessary parenting." She did not find it surprising that the visits with her parents went well and that afterwards, Charlene's extreme behaviors would accelerate.
In the summer of 1997 after one visit, Charlene's symptoms accelerated dramatically. She removed a window screen in her foster parents' home and climbed up on to the roof of the house. She did not sleep for three days and had extreme tantrums. Her therapist considered hospitalizing her, but as the symptoms began to subside, Charlene's medication was increased and visitation suspended.
The increase in Charlene's difficult behaviors shortly after visitation has been noted regularly for a long time, both when Charlene was first removed from the home and after her second removal in 1996. There was considerable testimony that the parents and the child were always physically affectionate with each other and appeared to be happy to see each other. Many visits went without incident. During Charlene's first placement, there are sporadic references in the visitation supervisors' logs to the types of incidents which were noted in more general terms by Dr. Sadler in 1997. On a visit on May 11, 1995, the supervisor wrote "Mother occasionally interacted with Charlene but spent a good portion of the time saying inappropriate things, for example asking the child if she would like to live with a relative and that "Mommy doesn't drink anymore". Mother also brought some pictures of other relatives and of one where "mommy is intoxicated" . . . He further reports that "Towards the end of the visit, the mother "thanked Charlene for squealing on her". "Mother's tone of voice made it difficult to tell in what sense she meant (that statement) (added phrase). Throughout the visits, CT Page 12017 mother would speak to Charlene as if she was an adult". Further, on June 21, 1995, "mother would occasionally interact, but at times seem to avoid it by directing her attention to any adult in the room." On June 28, 1995, the social services assistant commented "mother needs to spend more time with Charlene." On July 5, 1995, "Mother just seemed to look on and watch father and Charlene play." On July 12, 1995, mother tells Charlene "Mommy hasn't been drinking for over ninety days. Father interacts more with Charlene than mother."
During her second placement, all reporters found that the visits proceeded appropriately and both parents interacted well with Charlene. Nonetheless, when Charlene was returned to her foster home, her aggressive behaviors and emotional storms would increase substantially. The parents argue strenuously that because the visits have gone so well for such long periods of time and because they love their daughter and she them, the reports of Charlene's acting-out after visits are not credible. Further such behaviors, they claim, highlight the fact that Charlene misses her parents and wishes to be returned to them. Despite such claims, the psychiatrist, Dr. Sadler, found the foster parents' reports of "behavioral upsets and emotional and behavioral disorganization following parental visits" credible and "in my opinion, this is not an emotional reaction to being deprived of her parents, but rather a reopening of emotional wounds and emotionally distressing experiences. . . .". The court concludes from all the evidence and testimony that the reports of Charlene's accelerating difficult behaviors after visitation are credible. The court further adopts Dr. Sadler's conclusions concerning the causation of such behaviors.
The foster mother testified in detail to the difficulties of parenting this child and how she is resistant to changes and does best when the family remains at home. She described a barbecue in the summer of 1997 when Charlene saw her take a sip of beer, something she has not done since the child has been with her. Charlene immediately started screaming and crying.
Dr. Sadler, who psychiatrically evaluated Charlene in February of 1997, testified that he was unable to form a tentative diagnosis during the two hours that he spent with her. He stated he would need more time with Charlene, explaining that his assigned task was different. He found Charlene "quite complex in her presentation with significant emotional difficulties and impairments", the exact nature of which he was unable to CT Page 12018 determine. He stated that the drawings that Charlene made during the evaluation exhibited unconventional interests and concerns which were not typical of a child of her age and intelligence. In his report, he found that she:
 "was noted to have a subtle, but persistently unusual point of view and she made curious references to her drawings in her play. These references never formed a coherent or meaningful picture, yet they were described in an appropriate manner and without otherwise any suggestion of disorganized thinking."
He remarked upon the fact that after the evaluation with her foster parents, she functioned as she had when alone. After the evaluation with her parents, however, she was poorly organized, active and energetic and was difficult to control. She got into things in a non-playful way. When she drew after that joint meeting, she described her drawings in the same way, but the nature of the drawings was very different. She pounded the markers on the page with aggressive and destructive gestures and then scribbled over the pictures she drew — a jumble which she called "a whirlwind." He stated:
 "My clinical finding is that Charlene is more emotionally troubled than is easily visible from her day-to-day activities. There are no emotionally important people who Charlene can comfortably describe. Frequently in Charlene's discussions of her activities, bits and pieces of her perception of threats and dangers emerge."
He found that the foster parents ". . . have provided fully adequate care for Charlene during an extremely difficult time in her life and they have described considerable behavioral improvements in Charlene while under their care." He noted that they "demonstrate attentive, emotionally connected and interpersonally appropriate interactions with Charlene . . . and demonstrate both an understanding of their foster's child's needs as well as empathy for the complex emotional state of their foster child."
Adjudication
Both Paige B. and Robert B., Jr. have made impressive and laudable progress in their fight to overcome their alcohol addiction. Much evidence of the increasing success of their fight is from the most recent months. Nonetheless, as of October 21, 1996, the adjudicatory date, based on clear and convincing CT Page 12019 evidence, the court concludes that both parents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Charlene, they could assume a responsible position in the life of their daughter. Connecticut General Statutes § 17a-112 (c) (3) (B). While both parents participated in the services offered to them, neither was able to gain the level of insight into their parenting deficits to be rehabilitated as parents. As previously found, Charlene was adjudicated neglected for the second time on May 9, 1996. This child simply cannot wait any longer for the rehabilitation of her parents as she has immediate and strong needs for permanency.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). By October 21, 1996, Paige had taken some steps to accomplish such an outcome. But her relationship with her daughter remained a pathological one, in which she could not understand, comprehend, or minister to this child's significant specialized needs. While Robert B. was more connected to his daughter, his lack of insight into the marred relationship between Paige and Charlene prevented his effective parenting of this child. Rehabilitation within the foreseeable future is not likely, whatever levels of sobriety both parents may be able to maintain. In early 1996, the Department had hoped the parents were sufficiently rehabilitated to care for their daughter while she remained under protective supervision. Nonetheless, with the benefit of hindsight, that was not the case. The court finds, based on the clear and convincing evidence, this ground had existed as to both parents for substantially longer than one year prior to the filing of the termination petitions on October 21, 1996.
REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by the Department of Children and Families, including a parents aide when appropriate, counseling, transportation assistance, and visitation coordination. The services offered were extensive. CT Page 12020
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. There were heroic and repeated efforts made, only to have each such effort fail. Both parents received ongoing and significant services for reunification, but were unable to fully utilize those services to rehabilitate themselves.
3) The Department, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. Neither parent was able to remain sober while Charlene was in their care. While both parents completed many of the programs set for them in the court expectations, simply participating is not, in and of itself, enough. Change and insight are the goals of such efforts and both parents were unable to benefit to an adequate degree from the programs they attended.
4) The feelings and emotional ties of the child with respect to her parents, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Charlene knows and responds to both her parents. There is an ongoing emotional connection. The finding of this court is that the connection with the mother, Paige, is a pathological one. Neither Robert nor Paige have a parent-child relationship with their daughter. As noted by Dr. Sadler: ". . . there is a greater interest in a greater emotional connection to and a more elaborate history with her foster mother than her biological parents". Further, "it is to the Smiths that Charlene looks for care, emotional support and the day-to-day physical interactions that a parent provides for a child." The child's own reports of her experiences and memories only bolster this finding as she does not herself describe the connection to her biological parents they so clearly wish and desire existed. Despite all their best intentions, such a connection, however it may once have existed, has been obliterated by the shadow cast by the parents' alcohol-influenced parenting.
5) Finding regarding the age of the child. Charlene is six years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best CT Page 12021 interests of the child to return her to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Both Paige and Robert have exerted their best efforts to maintain contact with Charlene in an effort to reunite with her. They have had many visits, they send cards and gifts for their child. Nonetheless, even though they have repaired their own sometimes difficult interpersonal relationship and maintained sobriety for some considerable time, the court does not find it in the best interests of Charlene to return her to her biological parents' home. The parents have been unable, as previously found, to adjust their conduct as it relates to Charlene and her care, to make such a return feasible.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. . . . No inappropriate conduct is noted. The Department has taken many steps to encourage both parents to have a meaningful relationship with their child. While both parents believe that the foster parents have interfered with their efforts to reunite with Charlene, the court holds that the foster parents have not prevented the parents from having regular and meaningful contact with their daughter.
DISPOSITION
Paige B. has filed a motion for revocation of Charlene's commitment to the Department, which motion is pending before the court. Based on the evidence, the testimony and the findings made, the court denies the motion.
Charlene's permanent home and the identity of her major caretakers has been in question and in doubt for some three years. In her short lifetime, she was removed from her parents at age four, returned for a brief time at age five, removed yet once again and has now been in the same foster home for over one year. She has lived with uncertainty for almost half of her short life. She needs and deserves a place to call home with the knowledge that it will remain so for years to come. She needs and deserves individuals who will reliably parent her. The court finds, based on the clear and convincing evidence, that it is in her best CT Page 12022 interests to terminate her parents' rights to her. These findings are made after considering the special needs of this child, the length of time she had been separated from her parents, as well as her demonstrated need for a secure and permanent environment. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re JuvenileAppeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally,JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OFTHE CHILD 99 (1979.
It is hereby ORDERED that the parental rights of Paige B. and Robert B., Jr. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. As the foster parents wish to adopt Charlene, the court directs they be given first consideration. Further, a permanency plan for Charlene shall be submitted within 90 days. A review plan for her shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session